**Jodie SMOOK, Individually and on behalf of all other persons similarly situated, Plaintiffs,**

v.

**MINNEHAHA COUNTY, South Dakota; Jim Banbury, in his individual capacity; Todd Cheever, as Director of Minnehaha County Juvenile Detention Center; and John and Jane Doe Detention Center Officers, Defendants.**

**No. CIV. 00–4202.**

United States District Court,
D. South Dakota,
Southern Division.

Sept. 27, 2004.

James G. Abourezk, Abourezk Law Offices, Sioux Falls, SD, Juliet Berger–White, Mary M. Rowland, Matthew J. Piers, Gessler, Hughes, Socol, Piers, Resnick & DYM, Ltd., Chicago, IL, for Plaintiffs.

Gary P. Thimsen, Mary A. Akkerman, Susan M. Sabers, Woods, Fuller, Shultz & Smith, Sioux Falls, SD, for Defendants.

## MEMORANDUM OPINION AND ORDER

PIERSOL, Chief Judge.

Plaintiff filed a Motion for Partial Summary Judgment, Doc. 91, seeking summary judgment on the Fourth Amendment claims in this action. Defendants filed a Motion for Summary Judgment, Doc. 110, seeking summary judgment on all of the claims in this action. Plaintiff also filed a Motion to Strike the Defendant's Expert Report, Doc. 101. The motions have been fully briefed and the Court does not find that oral argument is necessary to decide the pending motions. For the reasons set forth below, the Court will grant Plaintiff's motion, grant Defendants' motion as to the claims of the third and fourth classes certified by the Court and deny Defendants' motion as to the claims of the first and second classes certified by the Court. The motion to strike will be denied.

### BACKGROUND

This is a class action involving allegations that Plaintiff Jodie Smook and the other class members were deprived of their constitutional rights by being strip searched and questioned about their religious beliefs and practices, pursuant to

institution policies, when admitted to the Minnehaha County Juvenile Detention Center ("JDC") for minor offenses in 1999. Smook asserts that she and three of her friends were arrested by Sioux Falls policemen for curfew violations on August 8, 1999. The four teenagers were taken to the JDC where they were questioned about their religious beliefs and practices, individually ordered into a bathroom, and strip searched.

The JDC had a policy of conducting visual strip searches of all minors regardless of the type of offense they were arrested for or whether there was reason to believe that the minors had weapons or contraband. The JDC also had a policy of questioning juvenile detainees about their religious beliefs and practices. The written strip search policy in effect on August 9, 1999, when Plaintiff was arrested, required a JDC staff person to escort the juvenile to the JDC's shower room, and instruct the juvenile to remove all of his or her clothing, including undergarments. The JDC staff person then conducted a thorough visual inspection of the juvenile's naked body. The juvenile was required to comb through and, if necessary, lift his or her hair and to turn around. The juvenile was required to take a shower in full view of the JDC staff. A complete search of the juvenile's clothing was also conducted by JDC staff. A JDC uniform was supplied to the juvenile after showering.

Before Plaintiff was taken to the JDC an expansion project was completed to add a new non-secure area to the JDC. Before the expansion project was completed, all minors were admitted to the secure area of the JDC. All minors brought to the JDC before the expansion project were required to take showers and the strip searches described above were conducted on all minors. After the expansion project was completed all minors entered the facility through the non-secure area. Although the written policies regarding strip searches were not changed, some of the JDC officers modified the strip search procedures for those minors not being admitted to the secure area of the JDC.

After the expansion project, some of the strip searches were conducted in a unisex bathroom in the new, non-secure area. A toilet, sink and shower stall were in the bathroom. The shower stall consisted of a brick wall from ceiling to floor, with an open entrance to the stall. If the minor was going to be at the JDC for less than approximately 15 minutes to one-half hour, some JDC officers did not require that minor to disrobe. Some JDC officers continued to search every minor that entered the JDC, even if the minor was only going to be there for five to ten minutes. If the minor was going to be in the non-secure area for over 15 minutes to one-half hour, but not going to be detained at the JDC, the minor was required to disrobe and be visually searched by a same-sex JDC officer. At least some of the JDC officers allowed these minors to keep their undergarments on while the visual search of the minor's body was conducted. The JDC staff would also search the minor's clothing before returning it to the minor. After both the visual search of the minor's body and the clothing search, the minor was allowed to put on his or her clothes. All searches in the unisex bathroom were conducted by one JDC officer of the same sex as the minor. There were no windows in the bathroom where the strip searches were conducted.

If a minor was going to be admitted to the secure area of the JDC, however, that minor was required to shower and subjected to the strip search procedure described above while showering. Thus, those minors admitted to the JDC even after the expansion project was complete were visually searched while naked by a JDC offi-

cer. The majority of the strip searches of minors being admitted to the JDC were conducted in the secure area of the JDC, which was separated into a girls' and boys' wing. Those separate wings contained shower areas that had multiple shower stalls separated by brick walls. The front of the shower was open to allow JDC staff to view the minors as they were showering.

On September 14, 1999, revised written policies were issued regarding the searching of juveniles brought to the JDC for a minor offense, such as curfew, petty theft, or liquor violations, or as a CHINS child, which is an acronym for children in need of supervision. Rather than being searched soon after arrival at the JDC, these juveniles were given a two-hour grace period to allow JDC staff to determine whether an appropriate adult was available and willing to take custody of the juvenile before a strip search was conducted. If JDC staff could not reach the juvenile's parents or the parents refused to take custody within two hours of being brought to the JDC, that juvenile would be subjected to the same strip search procedure as all other juveniles admitted to the JDC, which included showering and being visually searched while naked.

In September 1999 a change was also made to the procedure for showering juveniles and observing them. A screen was installed in the shower area, which allowed the JDC staff to view the juvenile only from the neck up and the knees down. Consistent with the JDC's past procedure, the juvenile's entire naked body continued to be observed by JDC staff before the juvenile entered the shower. The only exceptions for the showering requirement were if the juvenile was too intoxicated to shower, if medical reasons prohibited showering, or if the juvenile's behavior was such that taking a shower would endanger the juvenile or staff.

Plaintiff Smook was taken to the JDC on August 9, 1999, for a curfew violation, when the above-described written strip search policy was in effect, but after the time when at least some of the JDC officers did not require the minors to remove their undergarments, despite the existence of the written strip search policy. Plaintiff was one of those minors who was not required to remove her underwear and bra during the search. She was required to remove her shirt, shorts and sandals in a bathroom in the presence of a female JDC officer. When she was wearing her underwear and bra, she was visually inspected by a female JDC officer. The officer informed Plaintiff that she was being searched for drugs, drug paraphernalia and weapons. The JDC officer also touched Plaintiff's hair and toes while searching those areas of Plaintiff's body.

The Court certified four classes in this action, distinguished upon the claims and relief sought. The four certified classes are described as follows:

1. All persons seeking injunctive relief in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to a date to be set by the Court or were charged with non-felony offenses from April 16, 1999 to a date to be set by the Court, and were, pursuant to JDC policy, strip searched at the Minnehaha County Juvenile Detention Center.

2. All persons seeking compensatory and punitive damages in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to a date to be set by the Court or were charged with non-felony offenses from April 16, 1999 to a date to be set by the Court, and were, pursuant to JDC policy, strip searched at the Minnehaha County Juvenile Detention Center.

3. All persons seeking injunctive relief in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to September 14, 1999, or were charged with non-felony offenses from April 16, 1999 to September 14, 1999, and were, pursuant to JDC policy, subjected to questioning about their religious beliefs at the Minnehaha County Juvenile Detention Center.

4. All persons seeking compensatory ·and punitive damages in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to September 14, 1999 or were charged with non-felony offenses from April 16, 1999 to September 14, 1999, and were, pursuant to JDC policy, subjected to questioning about their religious beliefs at the Minnehaha County Juvenile Detention Center.

The term "minor offenses" in all four certified classes includes the offenses of petty theft, liquor violations, being a runaway and curfew violations. The term "non-felony offenses" in all four certified classes includes the offenses of unamenable, truancy, window peeking, tobacco, driving while revoked, contempt of court-CHINS, contempt of court-delinquent, disturbance of school, damage to private property, damage to public property, false impersonation, delinquent probation violation, delinquent violation court order, CHINS probation violation, CHINS violation court order, unlawful occupancy, failure to appear and disorderly conduct.

## DISCUSSION

### A. Motion to Strike Expert Report

Plaintiff moved to strike Defendants' expert's report as an improper legal conclusion. The report contains some legal conclusions, but it was considered by the Court for purposes of the summary judg-

ment motion. See Johnson Group, Inc. v. Beecham, Inc., 952 F.2d 1005, 1007 (8th Cir.1991) (holding that although the challenged expert's testimony "may have included inappropriate legal conclusions, we cannot conclude that the district court abused its discretion in admitting the testimony") (citing Hurst v. United States, 882 F.2d 306, 311 (8th Cir.1989) ("[a] trial court should exclude an expert opinion only if it is so fundamentally unsupported that it cannot help the factfinder.")). As further explained below, however, the Court rejects that portion of Dr. Kehoe's report that opines that the challenged JDC policies and procedures are "neither unconstitutional nor unlawful." (Doc. 90.)

### B. Motions for Summary Judgment

Summary judgment is appropriate if the moving party establishes that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law. Fed. R.Civ.P. 56(c); Anderson v. Liberty Lobby Inc., 477 U.S. 242, 256, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In reviewing a motion for summary judgment, this Court views the evidence in a light most favorable to the non-moving party. See Adickes v. S.H. Kress & Co., 398 U.S. 144, 158–59, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). "Once the motion for summary judgment is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and 'by affidavit or otherwise' designate 'specific facts showing that there is a genuine issue for trial.'" Commercial Union Ins. Co. v. Schmidt, 967 F.2d 270, 271 (8th Cir.1992) (quoting Fed.R.Civ.P. 56(e)).

### 1. Strip Searches

In considering a strip search policy at all federal Bureau of Prison facilities, the Supreme Court established a balancing test

courts are to use in determining whether a search is unreasonable:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

*Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

In 1985, the Eighth Circuit Court of Appeals held that a district court erred in denying the plaintiff's motion for judgment notwithstanding the verdict where plaintiff had been subjected to a visual strip search after his arrest on a minor offense of violating a leash law. *Jones v. Edwards,* 770 F.2d 739, 741 (8th Cir.1985). A violation of the leash law was not "the sort of crime to inspire officers with the fear of introducing weapons or contraband into the [jail's] holding cell." *Id.* Plaintiff was arrested at his home early in the morning and officers were with him at every moment after they read him the arrest warrant, which included watching him dress and go to the bathroom. *See id.* The Eighth Circuit concluded that security could not justify the blanket deprivation of constitutional rights that occurred. *See id.* at 742.

In another strip search case, the Sixth Circuit held it was clearly established in October 1986 that "a strip search of a person arrested for a traffic violation or other minor offense not normally associated with violence and concerning whom there is no individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband, is unreasonable [under the Fourth Amendment]." *Masters v. Crouch,* 872 F.2d 1248,

1255 (6th Cir.1989). The plaintiff in *Masters* was arrested for failing to appear in court for two traffic tickets. *See id.* at 1250. She was arrested at her home and transported to the corrections building where she was ordered to open her blouse and later subjected to a strip search of her entire body. *See id.* The Sixth Circuit held the defendant county officers and employees were not entitled to qualified immunity on plaintiff's strip search claim. *See id.* at 1257.

In 1993, the Tenth Circuit Court of Appeals held that a strip search of arrestees pursuant to a jail's blanket policy requiring all detainees, including those arrested for minor traffic offenses and awaiting bail, to be subject to a strip search violated the plaintiffs' Fourth Amendment rights. *Chapman v. Nichols,* 989 F.2d 393, 395–97 (10th Cir.1993). In *Chapman,* the plaintiffs were arrested for minor traffic violations, the jail officials had no reasonable suspicion that these particular arrestees were likely to be carrying or concealing weapons or drugs, and the plaintiffs were strip searched pursuant to the jail's blanket policy that all detainees be strip searched. *See id.* at 395. In affirming the denial of qualified immunity to the sheriff, the Tenth Circuit noted that "[e]very circuit court, including our own, which has considered the above circumstances under the *Wolfish* balancing test has concluded that a search under these circumstances is unconstitutional." *Id.* (citing cases from the Courts of Appeals in the Second, Fourth, Fifth, Sixth, Seventh, Eighth, Ninth, and Tenth Circuits). The defense of qualified immunity was denied to the defendant sheriff because in light of several circuit court of appeals' decisions, the Tenth Circuit found that a jail official could not have reasonably believed that a strip search policy applied to minor offense detainees, without particularized reason-

able suspicion, was lawful, even if conducted in private. *See id.* at 397–98.

In addition to the above decisions, several other federal Courts of Appeals have declared unconstitutional, jail or prison policies allowing or requiring persons arrested for traffic or other minor offenses to be strip searched in the absence of individualized reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband. *See Weber v. Dell,* 804 F.2d 796, 802 (2d Cir.1986) (holding that strip-body cavity search of arrestee who had been arrested for misdemeanor offenses was unconstitutional where jail authorities had no reasonable suspicion that arrestee was concealing weapons or other contraband); *Stewart v. Lubbock County, Texas,* 767 F.2d 153, 156–57 (5th Cir.1985) (strip search policy applied to minor offenders awaiting bond when no reasonable suspicion existed that they as a category of offenders or individually might possess weapons or contraband violated the Fourth Amendment); *Giles v. Ackerman,* 746 F.2d 614, 615 (9th Cir.1984) (strip search of person arrested for minor traffic offenses held unconstitutional in absence of individualized suspicion) (overruled on other grounds); *Hill v. Bogans,* 735 F.2d 391, 394–95 (10th Cir.1984) (held that routine strip searches in public area of persons detained for minor traffic offenses is unreasonable under Fourth Amendment); *Mary Beth G. v. City of Chicago,* 723 F.2d 1263, 1273 (7th Cir.1983) (strip search of misdemeanor offenders who were not inherently dangerous and who were being detained only briefly while awaiting bond violated the Fourth Amendment); *Logan v. Shealy,* 660 F.2d 1007, 1013 (4th Cir.1981) (strip search of DWI arrestee was held unconstitutional).

The written strip search policy in effect at the time Plaintiff was searched provided that all juveniles admitted to the JDC were to be searched for weapons, contraband and signs of abuse by requiring the juvenile to remove all of his or her clothing, including undergarments; being visually inspected while naked by a JDC staff member; and being observed while taking a shower. This blanket policy applied to minors arrested for minor offenses, such as curfew violations, alcohol violations and to CHINS children, as well as to minors arrested for more serious offenses. Moreover, the policy required JDC staff to conduct these strip searches without regard to whether the JDC staff had any reasonable individualized suspicion that the juvenile was carrying or concealing a weapon or contraband.

In support of their argument that the strip search policy was constitutional, the Defendants contend they were following nationally recognized standards recommending that all minors be strip searched before they are moved from the admission area to the detention area of the facility. Defendants cite the report prepared by their expert, Charles J. Kehoe, President of the American Correctional Association, who opines that at the time of Plaintiff's arrest, the JDC's policies and procedures were "consistent with national standards and good juvenile detention practices and were not unconstitutional or unlawful." (Kehoe Report at 8.)

■ Whether the JDC's strip search policy is unconstitutional or unlawful is a legal question for the Court to decide. *See Bell,* 441 U.S. at 559, 99 S.Ct. 1861 (setting forth the balancing test to be applied by courts in determining the reasonableness of a search under the Fourth Amendment); *Jones,* 770 F.2d at 740–42 (applying the *Bell* balancing test). Dr. Kehoe's conclusions that the JDC's policies and procedures were "neither unconstitutional nor unlawful" are legal conclusions and will be rejected to that extent. *See Estes v. Moore,* 993 F.2d 161, 163 (8th Cir.1993) (affirming

district court's rejection of an expert's proposed testimony regarding the existence of probable cause for an arrest because it was a legal conclusion rather than opinion testimony). That the JDC's policies may have complied with national standards issued by a trade association or the Department of Justice does not dictate that the policies were constitutional. Rather, the Court must apply the Supreme Court's balancing test applicable to alleged unconstitutional searches, which is quoted above, to determine whether the strip search policy and the search of Plaintiff violated the Fourth Amendment. *See Bell,* 441 U.S. at 559, 99 S.Ct. 1861.

■ One of the justifications for the existence of the JDC's strip search policy advanced by the Defendants is that these searches are necessary to detect abuse or neglect, so that JDC staff may comply with state law in reporting such instances, pursuant to SDCL § 26–8A–3. This argument is based upon a faulty premise: that JDC staff have a *duty to detect* abuse or neglect. The statute cited by Defendants in support of this argument provides that any court services officer or law enforcement officer "who [has] reasonable cause to suspect that a child under the age of eighteen has been abused or neglected ... shall report that information [to the proper authorities]." SDCL § 26–8A–3. While JDC staff must be alert to the signs of abuse or neglect of the minors in their care, this statute does not place an affirmative duty on JDC staff to discover abuse or neglect of any minor admitted to the JDC. Although JDC staff may have an interest in discovering child abuse and neglect, the Defendants have not cited and the Court has not found any authority holding that this interest justifies the invasion of the minor's personal rights involved in a strip search. Balancing the JDC's interest in discovering child abuse and neglect against the invasion of the minors' personal rights entailed in a strip search

leads this Court to the conclusion that the strip search policy in this case violates the minors' Fourth Amendment rights.

■ Another argument advanced by the Defendants in support of the constitutionality of the JDC's strip searches is that the searches of juveniles were reasonable administrative searches undertaken to satisfy an important government regulatory interest. The Defendants argue that "strip searches can be conducted on less than probable cause or reasonable suspicion where the government's legitimate security interest outweighs an inmate's privacy interest." (Defendants' Brief in Reply to Plaintiffs' Response to Defendants' Motion for Summary Judgment, Doc. 107.) As explained below, however, the Court does not find in this case that the JDC's legitimate security interest outweighs the minors' privacy interests.

Defendants contend the strip search policy is justified by the JDC's security interest in protecting those in its care, in addition to protecting the JDC staff. The Defendants attempt to distinguish the unconstitutional search in *Jones,* 770 F.2d at 742, from the present case. In that case, the Eighth Circuit held that: "[a]lthough we recognize that the security of detention facilities is an important concern of correction officials who are, in part, responsible for the safety of their charges, we also recognize that security cannot justify the blanket deprivation of rights of the kind incurred here." *Jones,* 770 F.2d at 742. The Court recognizes that the JDC has a security interest in preventing the introduction of weapons or contraband into its facility. The evidence in this record, however, does not demonstrate that the incidence of smuggling weapons or contraband into the JDC is more than minimal. *See Giles,* 746 F.2d at 617 (the evidence before the Court showed that the incidence of smuggling activity at the jail was minimal).

The JDC's security interest must be balanced against the invasion of personal rights entailed in a strip search conducted pursuant to its written policies. The invasion of personal rights entailed in a strip search conducted pursuant to its written policies is similar to the invasion involved in the courts of appeals' decisions discussed above. As recognized by the Tenth Circuit Court of Appeals "[t]he experience of disrobing and exposing one's self for visual inspection by a stranger clothed with the uniform and authority of the state, in an enclosed room inside a jail, can only be seen as thoroughly degrading and frightening. Moreover, the imposition of such a search upon an individual detained for a lesser offense is quite likely to take that person by surprise, thereby exacerbating the terrifying quality of the event." *Chapman*, 989 F.2d at 396 (citations omitted). In this case, minors are required to completely disrobe in front of a same-sex JDC official and are visually inspected by a JDC official before they take a shower, in the absence of any suspicion that they are carrying or concealing a weapon or other contraband. As the Tenth Circuit held "[t]here can be no doubt that a strip search is an invasion of personal rights of the first magnitude." *Chapman*, 989 F.2d at 395. Interestingly, Defendants have not cited a case in which the security interest of a correctional facility has outweighed the personal rights of a person arrested for a minor offense, who was subjected to a strip search in the absence of any individualized suspicion that the arrestee was carrying or concealing a weapon or other contraband.

Similar to the *Giles* court, balancing the JDC's security interest against the privacy interests of the class members, the Court holds that minors charged with minor or non-felony offenses may be subjected to a strip search only if JDC officials possess a reasonable suspicion that the individual minor is carrying or concealing a weapon or other contraband. *See Giles,* 746 F.2d at 617. Reasonable suspicion may be based on such factors as the nature of the offense, the minor's appearance and conduct, and the prior arrest record. *See id.*

The change to the strip search policy made in September 1999 did not cure the unconstitutionality of the policy. Rather, the two-hour grace period likely spared some minors from being strip searched in violation of the Fourth Amendment. The minors who were not picked up within two hours were subjected to the same unconstitutional search as those minors strip searched before the September 1999 policy change.

In addition to the two-hour grace period, Defendants emphasize that there was a screen installed in the shower to shield the minors' naked bodies from their necks down and their ankles up. The record is unclear whether this screen was installed only in the one shower in the unisex bathroom located in the non-secure area of the JDC, or whether there were screens also installed in the multiple showers in the girls' wing in the secure area of the JDC. In any event, a shower screen did not cure the unconstitutionality of the strip searches, because JDC staff visually searched all minors required to shower before entering the shower.

■ Now that the Court has held the JDC's written strip search policy is unconstitutional, the Court turns to the specific search of the Plaintiff in this action. Defendants seek to minimize the intrusion of the class members' personal rights by pointing out that Plaintiff was not required to shower or remove her underwear and bra during the search of her body and clothing. Defendants state in their brief that "[j]uveniles were asked to remove only their outer clothing, not their undergarments, (Devlin Dep. at 13), a policy more lenient than recommended by nation-

al standards." (Defendants' Brief in Support of Motion for Summary Judgment, Doc. 87.) The record does demonstrate that some minors were not required to shower or remove their undergarments during their searches.

When asked whether minors were asked to remove their undergarments during the clothing search, one JDC official, Bridget Devlin, responded "I never—I don't recall asking anyone to do that. I mean, you can pretty much see what's there when they're in undergarments so -." (Devlin Dep. at 15.) Later in her deposition, Devlin does state that she did not require minors to remove their bras and underwear (Devlin Dep. at 31), and that if a minor was having issues with or was a little embarrassed by undressing in front of someone else she tried to afford them the right of dressing in the shower area. (Devlin Dep. at 39.) Jim Banbury, the Director of the JDC in 1999 testified, however, that during the time from when the expansion project was completed to the issuance of the revised written policies on September 14, 1999, JDC officers were inconsistently applying the JDC's written search policies that applied before the non-secure area was completed. (Banbury Dep. at 38–39, 53–54.) Some JDC officers were fully complying with the written strip search policy held unconstitutional above and others were modifying the searches to not require removal of undergarments. (*Id.*) Despite the inconsistencies in applying the written search policies to those minors not admitted to the secure area of JDC, all of the class members required to take showers, whether housed in the secure or non-secure area, were visually searched while naked. And those minors subject to clothing searches, but were not required to shower, were required to at least remove all clothing except their undergarments and were subjected to a visual search of their bodies while wearing only their undergarments.

That the JDC official who searched Plaintiff did not require her to remove her underwear and bra in addition to her other clothing does not result in a different outcome from the holding above that the JDC's written strip search policy is unconstitutional. The Court described in detail above the written strip search policy in effect at the time Plaintiff was brought to the JDC on August 9, 1999, and the modifications to the policy on September 14, 1999, and the reasons it is unconstitutional. Although some JDC officials were not complying with the written procedure requiring all minors to completely disrobe and shower, the Court is unwilling to draw the line between constitutional and unconstitutional searches at whether the person being searched is completely nude or nearly nude. Defendants do not cite and the Court has not found a case drawing such a distinction. Rather, the Eleventh Circuit described a visual search of a female juvenile who was required to remove all of her outer clothing and her bra, but was allowed to keep her underwear on, as a "strip search," and did not draw a distinction between a search while wearing one's undergarments as less invasive than a search while completely nude. *See Justice v. City of Peachtree City,* 961 F.2d 188, 190–91 (11th Cir.1992).

The Eleventh Circuit Court of Appeals applied the Supreme Court's balancing test set forth in *Bell* to determine whether the strip search of the minor plaintiff violated her Fourth Amendment rights. *See id.* at 191–94. Despite the fact that the minor was allowed to keep her underwear on during the search, the Eleventh Circuit recognized that "[c]hildren are especially susceptible to possible traumas from strip searches .... [Y]outh is more than a chronological fact. It is a time and condition of life when a person may be most susceptible to influence and to psychological damage." *Id.* at 192 (citations and quotation

marks omitted). The strip search in *Justice* of a female juvenile required to remove all clothing except her underwear was found constitutional only because the Defendants had reasonable suspicion to believe the juvenile was carrying or concealing contraband. *See id.* at 194. In the present case Plaintiff's nearly naked body was visually searched for weapons and contraband, when she was arrested for a curfew violation, without any suspicion that Plaintiff was carrying or concealing such items.

Applying the balancing test to the search of the Plaintiff, the Court concludes that the search violated her Fourth Amendment rights. Plaintiff was arrested for a minor offense, a curfew violation. Like the offenses for which the plaintiffs in several courts of appeals regarding strip searches, a curfew violation is not normally associated with weapons, violence or drugs. *See, e.g., Chapman,* 989 F.2d at 395–97 (minor traffic violations); *Masters,* 872 F.2d at 1255 (minor traffic offense); *Giles,* 746 F.2d at 618 (recognizing that the plaintiff's traffic violation was related neither to drugs nor to weapons); *Jones,* 770 F.2d at 740–41 (leash law violation); *Logan,* 660 F.2d at 1013 (driving while intoxicated). JDC officials had no suspicion that she was carrying or concealing a weapon or other contraband. There is no indication that Plaintiff had a prior delinquency record. There is evidence that Plaintiff was emotionally upset and crying while she was at the JDC, but there is no evidence that she was anything but cooperative and orderly. Weighing the intrusiveness of the strip search, even taking into account that Plaintiff was not required to remove her bra and underwear, against the minimal showing of need to conduct the indiscriminate search, the Court concludes that the search of Plaintiff on August 9, 1999, violated her Fourth Amendment rights.

Defendants contend that Defendant Banbury, former Director of the JDC, and Defendant Todd Cheever, current Director of the JDC, are entitled to qualified immunity from the Plaintiff's and the other class members' claims for monetary damages. Jail officials are "protected by qualified immunity so long as 'their actions could reasonably have been thought consistent with the rights they are alleged to have violated.'" *Gregoire v. Class,* 236 F.3d 413, 417 (8th Cir.2000) (quoting *Anderson v. Creighton,* 483 U.S. 635, 638, 107 S.Ct. 3034, 97 L.Ed.2d 523 (1987)). "To overcome this qualified immunity, the plaintiff must 'assert a violation of a constitutional or statutory right; that right must have been clearly established at the time of the violation; and, given the facts most favorable to the plaintiff, there must be no genuine issues of material fact as to whether a reasonable official would have known that the alleged action indeed violated that right.'" *Id.* (quoting *Liebe v. Norton,* 157 F.3d 574, 577 (8th Cir.1998)).

The lack of a Supreme Court ruling on the constitutionality of strip searching juveniles in a detention facility, does not preclude a finding that the law was clearly established that the search of the Plaintiff and the other class members violated their Fourth Amendment rights. The Eighth Circuit has recognized that in determining whether a right is clearly established for purpose of the qualified immunity defense:

> "[I]t is not necessary that the Supreme Court has directly addressed the issue, nor does the precise action or omission in question need to have been held unlawful. In the absence of binding precedent, a court should look to all available decisional law including decisions of state courts, other circuits and district courts ...."

*Burnham v. Ianni,* 119 F.3d 668, 677 (8th Cir.1997) (quoting *Hayes v. Long,* 72 F.3d 70, 73 (8th Cir.1995) (citation omitted)).

■ It is asserted in this action that Defendants Banbury and Cheever violated Plaintiff's and the other class members' Fourth Amendment right to be free from unreasonable searches. By the time of the violations involved in this action, it had been clearly established for several years that the Fourth Amendment protected persons from the kinds of searches of which Plaintiff and the class complain. *See Jones,* 770 F.2d at 742 n. 4 (denying qualified immunity to jail officials who conducted a strip search in 1981 on a person arrested for minor offenses without any suspicion that he was harboring weapons or contraband and holding that "the fourth amendment's protection against the kind of search of which Jones complains was well-established at the time his search took place."). In addition to the Eighth Circuit, the Court cited above seven other federal courts of appeals that have ruled strip searching arrestees of minor offenses without at least reasonable suspicion that the arrestee is carrying or concealing a weapon or other contraband violates the arrestees' Fourth Amendment rights. Those courts applied the Supreme Court's balancing test set forth in *Bell,* 441 U.S. at 559, 99 S.Ct. 1861, in reaching their conclusions, as the Court has done in this case.

Defendants Banbury and Cheever argue that because their actions complied with national standards for good practice in the operation of juvenile correctional facilities, they are entitled to qualified immunity. It is noted that it has not been established on the record in this case that Defendants Banbury and Cheever were aware of the nationally recognized standards cited by Defendants' expert. In any event, even if they were aware of those standards, they are not entitled to the protection of qualified immunity because such standards do not override clearly established law. Based upon the established case law from the Eighth Circuit, as well as the seven other Circuit Courts of Appeals to have ruled on the unconstitutionality of strip searching persons arrested for minor offenses without any reasonable individualized suspicion of carrying or concealing contraband or weapons, the Court finds that there is no genuine issues of material fact as to whether a reasonable official would have known that the strip searches involved in this action indeed violated the class members' Fourth Amendment rights. Thus, Defendants Banbury and Cheever are not entitled to qualified immunity on Plaintiff's and the other class members' claims for monetary damages.

*2. Religious Preference Questioning*

■ Defendants seek summary judgment on the claims of the third and fourth classes certified by the Court regarding the JDC's policy and procedure in questioning minors being admitted to the JDC about their religious preferences. If a minor refused to answer the questions about their religious preferences, he or she was not forced to answer the questions and was not punished for refusing to answer. The minors that did answer the questions were not treated more or less favorably than any other detainees.

Defendants contend that the religious preference questions were asked to help JDC staff ensure that any required dietary restrictions or observances were met. Defendants argue that there was no infringement of the class members' rights to privacy or free exercise of religion as a result of the challenged questions.

In response to Defendants' motion, class counsel concedes "[s]ince the constitutional violation in this regard would result in only nominal damages and the defendants have discontinued the practice, plaintiffs are seeking only declaratory relief under Count II." (Plaintiffs' Response to Defendants' Motion for Summary Judgment,

Doc. 104.) As a result of this abandonment of a claim for monetary damages, Defendants are entitled to summary judgment on all claims asserted by the fourth class certified by the Court seeking monetary damages for the Defendants' practice of questioning minors about their religious beliefs.

In light of the Defendants' discontinuance of questioning minors about their religious beliefs and the abandonment of any claim for damages on that claim, the Court must examine whether a live case or controversy continues to exist. "Article III of the Constitution only allows federal courts to adjudicate actual, ongoing cases or controversies." *Potter v. Norwest Mortgage, Inc.*, 329 F.3d 608, 611 (8th Cir.2003). "When an action no longer satisfies the case or controversy requirement, the action is moot and a federal court must dismiss the action." *Id.* (citing *Minn. Humane Soc'y v. Clark*, 184 F.3d 795, 797 (8th Cir.1999)). The Supreme Court explained:

> It has long been settled that a federal court has no authority "to give opinions upon moot questions or abstract propositions, or to declare principles or rules of law which cannot affect the matter in issue in the case before it." .... For that reason, if an event occurs while a case is pending on appeal that makes it impossible for the court to grant "any effectual relief whatever" to a prevailing party, the appeal must be dismissed.

*Church of Scientology of California v. United States*, 506 U.S. 9, 12, 113 S.Ct. 447, 121 L.Ed.2d 313 (1992) (citations omitted). In this case, the Defendants discontinued the practice of asking minors admitted to the JDC about their religious beliefs. There is no evidence in the record to suggest that the Defendants intend to reestablish this practice. Even if the Court were to find the practice violated Plaintiff's and the other class members'

constitutional rights, the withdrawal of the claim for monetary damages makes it impossible for the Court to grant "any effectual relief whatever" to the class. *Id.* Declaratory relief on the religious questioning practice as requested by Plaintiff "cannot affect the matter in issue in the case" before the Court. Thus, the Court finds the claims of the third class certified by the Court must be dismissed without prejudice as moot.

## CONCLUSION

The Court will deny Plaintiff's Motion to Strike, Doc. 101, but the Court rejects that portion of Dr. Kehoe's report where he opines that the JDC's policies and practices are "neither unconstitutional nor unlawful." It is for the Court to determine whether the JDC's policies and practices are unconstitutional or unlawful. For the reasons set forth above, the Court concludes that the JDC's blanket policy of strip searching minors arrested for minor or non-felony offenses, without any individualized determination of reasonable suspicion that the individual was or is likely to be carrying or concealing weapons, drugs or other contraband, violates the Fourth Amendment. Furthermore, the strip search of the Plaintiff, Jodie Smook, violated her Fourth Amendment rights. The members of the first two classes certified by the Court, therefore, are entitled to summary judgment on their claims that the strip searches they endured at the JDC pursuant to the JDC's blanket strip search policy violated their Fourth Amendment rights to be free from unreasonable searches. The remaining issues relating to the strip search claims are: 1) what type of injunctive relief is appropriate in this case; 2) what amount of monetary damages are appropriate and how should the class members' damages be determined; 3) what should the ending date be for membership in the first two classes certified by the Court.

The claims asserted by the third class certified by the Court, the class seeking injunctive relief for being questioned about their religious beliefs, will be dismissed without prejudice as moot. Summary judgment will be entered in favor of the Defendants, and against the fourth class certified by the Court, because the class has abandoned the damages claim for being subjected to questioning about their religious beliefs at the JDC. Accordingly,

IT IS ORDERED:

1. That Plaintiff's Motion to Strike Expert Report, Doc. 101, is denied.

2. That Plaintiff's Motion for Partial Summary Judgment, Doc. 91, is granted.

3. That Defendants' Motion for Summary Judgment, Doc. 86, is (a) granted to the extent that the claims by the third class, seeking injunctive relief based on religious questioning, are dismissed without prejudice as moot; (b) granted as to the claims by the fourth class, seeking damages based on religious questioning; and (c) denied as to the strip search claims asserted by the first and second classes.

4. That at the close of the case, judgment will be entered in favor of Defendants on the claims of the following classes:

All persons seeking injunctive relief in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to September 14, 1999, or were charged with non-felony offenses from April 16, 1999 to September 14, 1999, and were, pursuant to JDC policy, subjected to questioning about their religious beliefs at the Minnehaha County Juvenile Detention Center.

All persons seeking compensatory and punitive damages in this action who, when they under the age of eighteen years, were charged with minor offenses from November 1, 1997 to September 14, 1999 or were charged with non-felony offenses from April 16, 1999 to September 14, 1999, and were, pursuant to JDC policy, subjected to questioning about their religious beliefs at the Minnehaha County Juvenile Detention Center.

5. That, on or before October 11, 2004, Plaintiff shall file and serve a proposed plan to conclude the monetary damages and injunctive relief issues remaining on the strip search claims as well as propose an ending date for membership in the first two classes certified by the Court. On or before November 1, 2004, Defendants shall file and serve a response to Plaintiff's plan, and if they do not agree with Plaintiff's plan they shall include a proposed plan. Plaintiff shall file and serve a reply to Defendants' response, on or before November 11, 2004.